ACCEPTED
03-15-00325-CV
8285331
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/17/2015 1:52:17 PM
JEFFREY D. KYLE
CLERK

## No. 03-15-00325-CV

_____

IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/17/2015 1:52:17 PM
JEFFREY D. KYLE
Clerk

_____

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

JESSICA LUKEFAHR,

*Appellee.*

_____

On Appeal from
the 345th Judicial District Court of Travis County, Texas
Trial Court Case No. D-1-GN-14-002158
The Honorable Stephen Yelenosky, Presiding

_____

## APPELLEE'S RESPONSE BRIEF

_____

MAUREEN O'CONNELL
Texas Bar No. 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
T: 512.458.5800
F: 512.458.5850
moconnell458@gmail.com

*Attorney for Appellee*

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................i

TABLE OF AUTHORITIES ..................................................................................... ii

ARGUMENT ..........................................................................................................2

    I.    HHSC's Exceptional Circumstances Rule Does Not Require the Submission of "Medical Literature" to Establish Medical Necessity for DME....................................................................................2

    II.   HHSC's Explanation for the Agency's Lack of Criteria for Integrated Standers Has No Merit..................................................4

    III.  The Parties Agree that Jessica was Not Required to Seek Prior Authorization of a Separate Stander as Part of Her Request for a Custom Power Wheelchair with Integrated Stander ...................................6

    IV.  HHSC Failed to Refute the Professional Opinion of Jessica's Treating Medical Providers that She Cannot Utilize a Separate Stander.....................................................................................................7

    V.   HHSC's Defense of TMHP's Denial Notice Does Not Affect the District Court's Decision........................................................8

CONCLUSION AND PRAYER .........................................................................9

CERTIFICATE OF COMPLIANCE....................................................................10

CERTIFICATE OF SERVICE ..........................................................................10

i

# TABLE OF AUTHORITIES

**CASES**

*Koenning v. Janek*,
   539 F. App'x 353 (5th Cir. 2013) ........................................................................4

*Koenning v. Suehs*,
   897 F. Supp. 2d 528 (S.D. Tex. 2012).............................................................4

*TGS–NOPEC Geophysical Co. v. Combs*,
   340 S.W.3d 432 (Tex. 2011) ...........................................................................2


**REGULATIONS**

1 TEX. ADMIN. CODE § 354.1039(a)(4)(D) ...........................................................2, 3

42 C.F.R. § 431.12 ....................................................................................................3


**STATUTES**

42 U.S.C. § 1396a(a)(17).........................................................................................4

**No. 03-15-00325-CV**

_____

IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS

_____

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

JESSICA LUKEFAHR,

*Appellee.*

_____

On Appeal from
the 345th Judicial District Court of Travis County, Texas
Trial Court Case No. D-1-GN-14-002158
The Honorable Stephen Yelenosky, Presiding

_____

**APPELLEE'S RESPONSE BRIEF**

_____

TO THE HONORABLE COURT OF APPEAL:

On December 7, 2015, more than 30 days after the filing of Appellee's Sur

Reply, Appellant Texas Health and Human Services Commission (HHSC) filed a

Response to Appellee's brief.[1]  As before, Appellee, Jessica Lukefahr, respectfully

responds to Appellant's most recent brief to address the matters addressed therein.

---

[1] To the extent additional briefing is allowed, Tex. R. App. P. 38.6(c) suggests that such briefs must be filed within 20 days of the preceding brief. As such, HHSC's Response Brief is untimely.

1

## ARGUMENT

**I. HHSC's Exceptional Circumstances Rule Does Not Require the Submission of "Medical Literature" to Establish Medical Necessity for DME.**

HHSC claims its denial of Jessica's wheelchair request "should have been affirmed" because she "failed to provide evidence-based medical peer-reviewed literature in support of her exceptional circumstances request.[2] Appellant's Response Brief, pp. 2-3. This is incorrect.[3] HHSC's exceptional circumstances rule, 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D), neither mandates nor mentions the submission of medical literature to establish that a requested item of durable medical equipment (DME) will meet a "specific medical purpose."[4] As explained by HHSC at a recent public meeting, this "medical literature" requirement "has not been previously posted in [agency] policy nor has that process been in Rule." App. B, p. 2:16-18.

---

[2] In fact, the medical literature submitted on Jessica's behalf collectively reviews more than 40 research studies investigating the medical and functional benefits of supported standing. *See* Appellee's Brief, pp. 24-26. Appellant's assertion that this literature did not rise to the level of research required by TMHP's process is incorrect. Appellant's Response, p.3.

[3] HHSC's hearing decision contains no finding concerning this "medical literature" requirement.

[4] Administrative rules must be construed "in the same manner as statutes" and the plain language of this rule does not include the "medical literature" requirement upon which HHSC relies. *See* *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 438 (Tex. 2011) (*citation omitted*).

2

In fact, this provision derives from an internal exceptions process established by the Texas Medicaid and Healthcare Partnership (TMHP) in October 2012.[5] As part of this process, DME suppliers are informed they must submit:

> a minimum of two articles from evidence-based medical peer-reviewed literature that demonstrate validated, uncontested data for use of the requested equipment to treat the recipient's specific medical condition, and that the requested equipment has been found to be safe and effective.

TMHP's "medical literature" requirement is an unreasonable standard for determining eligibility for DME. This was recently demonstrated when HHSC failed in its attempt to add this requirement to 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D). In June 2015, HHSC submitted this proposed rule amendment to the agency's Medical Care Advisory Committee (MCAC).[6] The MCAC flatly rejected HHSC's proposed "medical literature" requirement and unanimously voted to send the rule amendment back to the agency.[7] As explained by a MCAC member and former medical director for HHSC:

---

[5] HHSC explained this at the public meeting:
> In our Medical policy and Rules, we specifically lay out what DME is available to Medicaid clients. There are lots of DME products though, as you can imagine, and there not all listed in policies, so for an adult who wants access to a DME, a piece of DME that is not currently listed in policy, there is a process that takes place. This process has been in place since October of 2012. App. B, p. 2: 3-12.

[6] Pursuant to 42 C.F.R. § 431.12, state Medicaid programs are required to establish such committees to participate "in policy development and program administration…"

[7] One committee member expressed her concern that this new requirement would be "absolutely burdensome" and "absolutely have a negative impact on the Medicaid members." App. B, p. 7: 20-23. Another member voiced similar concerns:
> I, too am quite concerned about this, coming from a university environment to find uncontested data or - - you know, you can always find something to counter one

3

In the meantime, I would like HHSC to explore a way to kind of back off from what seems to me on the face of it to be a very inappropriate standard of proof … So how you could put that standard of proof on these items is sort of beyond me…and also, if I understand correctly, the process we're talking about here applies to adults, correct? So it doesn't apply to EPSDT [Children's Medicaid Services]. So somebody who is 20 years old and six months could get the exact same piece of requested equipment without having this standard applied to them - - or this process applied to getting this piece of equipment.

App. B, p. 18:5-8; 13-20 (Statement of Dr. John Hellerstedt)

This requirement violates the Medicaid Act's reasonable standards provision, 42 U.S.C. § 1396a(a)(17), and is contrary to the plain language of the agency's exceptional circumstances rule.[8] As such, this "very inappropriate standard of proof" provides no basis for reversing the district court's decision.

## II. HHSC's Explanation for the Agency's Lack of Criteria for Integrated Standers Has No Merit.

HHSC's purported rationale for the agency's lack of clinical criteria for determining whether a wheelchair standing feature will serve a specific medical

---

study [with] another… But the other thing I have heard that causes me concern is that one, I've never heard - - when you have a physician and a PT and an OT saying that this is going to be useful, I've never heard of the client having to go and research and find these - - you know, proof and find these studies. You know, many clients can't do that. Many providers can't do that… So I really have some problems with this and will have to vote against it because I think it is unreasonable to expect, you know, the providers and the clients to go do this scientific research.
App. B, p. 8: 9-12; 17-22, p. 9:7-10.

[8] Prior to 2012, HHSC did not allow exceptional circumstance appeals for wheelchairs with integrated standing features. Following the district court's decision in *Koenning v. Suehs,* 897 F. Supp. 2d 528, 552-53 (S.D. Tex. 2012) *vacated sub nom. Koenning v. Janek,* 539 F. App'x 353 (5th Cir. 2013), HHSC made this review available to Medicaid beneficiaries seeking this item of DME, but allowed TMHP to add its "medical literature" requirement to the process.

4

purpose does not support reversal of the district court's decision. To the contrary, this argument further demonstrates that the district court correctly found the agency's decision to be arbitrary and capricious. CR 226.

HHSC's hearing decision clearly stated that the agency's Office of Medical Director "determined that the client's condition did not meet the *clinical criteria* for the Exceptional Circumstances provision for a Permobil C500 VS power wheelchair with integrated standing feature." (*emphasis added*). Appellant's Brief, App. B, AR 571, Finding of Fact No. 9; App. C, AR 589, Finding of Fact No. 9. Faced with the fact that HHSC's witnesses could not identify a single clinical criterion applied to requests for wheelchairs with integrated standers or to name a single medical purpose that could justify approval of an integrated stander, the agency now argues that "no set clinical criteria" exists so that the agency can consider these requests on an "individual case basis." Appellant's Response Brief, p. 3. This rationale does not explain the apparent contradiction between the agency's specific finding of fact on this point and its argument on appeal. Nor does it explain why HHSC's witnesses could not identify the criteria applied "on an individual case basis" to Jessica's specific request. At the fair hearing, HHSC's inability to provide this information led to the agency's concession that "a standing program [for Jessica] is important to address the concerns that have been presented today. All of that documentation justifies standing . . ." HR 1:26:55-1:27:12. *See* Appellee's Brief, p.19. HHSC's

5

argument does not support its contention that the hearing decision "should have been affirmed" Appellant's Response Brief. p.4.

## III. The Parties Agree that Jessica was Not Required to Seek Prior Authorization of a Separate Stander as Part of Her Request for a Custom Power Wheelchair with Integrated Stander.

In its initial brief, HHSC stated that "no prior authorization request for a static stander has been submitted to Texas Medicaid."[9] Appellant's Brief, p.9. In response, Jessica noted that:

> HHSC suggests there is some significance to the fact that "no prior authorization request for a static stander has been submitted to Texas Medicaid." HHSC Brief p.9. While this fact is true, it is also irrelevant. There also was no prior authorization request for a postural walker as Jessica's medical professionals determined that both of these items of DME will not meet her medical and functional need to stand. And as the district court correctly noted, this point was not identified as a reason for the denial in TMHP's notice to Jessica. CR 222, HHSC App. G, p. 2, n. 3.

Appellee's Brief, p. 20, n. 20.

HHSC replied by again suggesting that the absence of a prior authorization request for a separate stander had some bearing on the outcome of the hearing. According to the agency, "[a]lthough Ms. Lukefahr claims that failure to request a static stander was not provided as a reason for denial, this is contradicted by the record." Appellant's Reply Brief, pp. 8-9. Whatever point HHSC intended by these

---

[9] HHSC's alternative contention that Jessica failed to show what alternative DME had been ruled out by her medical providers is patently erroneous, as previously explained in Appellee's Brief, pp. 8, 13, 20-28, 31-32 and Appellee's Sur-Reply, pp. 12-18.

6

earlier statements, HHSC now agrees there is no "requirement that alternative DME must be requested for prior authorization prior to submitting an exceptional circumstances request, and no such requirement exists in law or policy." Appellant's Response Brief, p. 5. There is no dispute on this point. Nor is there any basis for reversing the district court's decision.

**IV.    HHSC Failed to Refute the Professional Opinion of Jessica's Treating Medical Providers that She Cannot Utilize a Separate Stander.**

Jessica's exceptional circumstances review presented two questions: (1) does she have a medical need for supported standing, and if so (2) is there an equally effective alternative item of DME that will meet this medical need. As to the first question, the district court correctly noted that "there is no evidence to contradict [Jessica's] treating physician's assessment that she 'has a medical need to standing numerous times throughout the day to avoid the secondary conditions that result from prolonged sitting.'" CR 224. In addressing the second question, the court determined that "[t]here is no evidence rebutting her treating physician's statement that she would need assistance from a care provider to use a static stander or the fact that she does not have a care provider throughout the day." CR 224.

Jessica does not "conflate" these two issues as HHSC now claims. Once HHSC's witness conceded Jessica's medical need to stand, the agency had the burden to refute the professional opinion of Jessica's medical providers that a

7

separate stander will not meet her needs.[10]  CR 222.  As previously explained, HHSC failed to prove that a separate stander will suffice.[11]  Appellee's Brief, pp. 13-14, 19-27; Appellee's Sur-Reply, pp. 6-13.  Jessica properly addressed both questions, as did the district court. CR 222-224.

## V.  HHSC's Defense of TMHP's Denial Notice Does Not Affect the District Court's Decision.

HHSC's final argument in defense of TMHP's denial notice notes that this letter identified the agency's exceptional circumstances rule as the legal basis for its decision. In fact, this notice included 7 citations to federal and state Medicaid provisions, none of which supported the agency's identified reasons for denial.  Due process  requires specific reasons for denial, which are supported by specific rules or policy.  Once identified, these reasons "constrain" HHSC at every stage of review. CR 221.  HHSC cannot come behind the notice and offer new reasons for the denial at the hearing, in the district court, or on appeal.  As before, HHSC offers no credible argument supporting reversal of the district court's decision.

---

[10] HHSC's revival of its initial claim that the "main reason for requesting a standing power wheelchair was to help [Jessica] progress at work" and "not for the treatment of [her] medical condition is illogical in light of the agency's clear concession that she has a medical need to stand. *See* AR59; Appellant's Response Brief, p. 6. As previously explained, the uncontroverted evidence established that Jessica's medical need to stand can occur at any time, in any location. Appellee's Brief, pp. 12-13, 20-24; Appellee's Sur-Reply, pp. 6-12.

[11] Contrary to HHSC's assertion, Jessica has not ignored Ms. Claey's claim the documentation did not "speak" to the need for the stander to be part of the wheelchair.  HHSC's Response Brief, p. 5. Having twice quoted this testimony in Appellee's Brief, pp 11 and 20, Jessica has demonstrated it is erroneous and unsupported by any probative evidence in the administrative record. Certainly, HHSC's hearing decision did not identify any evidence provided by the agency on this critical issue. Appellant's Brief, App. B and C.

## CONCLUSION AND PRAYER

For the reasons described in Appellee's Brief, Sur-Reply and above, Jessica Lukefahr respectfully requests this Court to affirm the decision of the district court so that she can obtain the custom power wheelchair recommended by her treating medical professionals more than two years ago.

Respectfully submitted,

___/s/ Maureen O'Connell_____
MAUREEN O'CONNELL
Texas Bar No. 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
(512) 458-4800 (Phone)
(512) 458-5850 (Fax)
moconnell458@gmail.com

*Attorney for Appellee*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Tex. R. App. P. 9.4(i)(2)(B) because it contains 2,214 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(1).

2.      This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

 /s/ Maureen O'Connell
MAUREEN O'CONNELL

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December, 2015, a true and correct copy of the foregoing document was electronically filed, and that a true and correct copy of the foregoing document was served by electronic mail on the same date to:

Kara Holsinger
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711

 /s/ Maureen O'Connell
MAUREEN O'CONNELL



INTEGRITY
legal support solutions

TRANSCRIPTION OF ELECTRONIC RECORDING

HEALTH AND HUMAN SERVICES COMMISSION

MEDICAL CARE ADVISORY COMMITTEE (MCAC)

JUNE 9, 2015

PARTIAL TRANSCRIPT OF MEETING

ITEM #20: EXCEPTIONAL CIRCUMSTANCES, CHAPTER 354

LAURIE VANHOOSE, DIRECTOR, POLICY DEVELOPMENT, HHSC

**MEMBERS PRESENT:**

Gilbert Handal, MD, Chair
Colleen Horton, Vice Chair
Edgar Walsh, R. Ph
Mary Helen Tieken, RN
George Smith, DO
Donna Smith, PT
Michele Bibby
John Hellerstedt, MD
Elvia Rios
Doug Svien
William Galinsky, HPAC Representative

**MEMBERS ABSENT:**

Joane Baumer, MD, PPAC Representative

ORIGINAL

Austin
tel |512|320 8690
fax |512|320 8692

Dallas
tel |972|364 9777
fax |972|364 9778

Houston
tel |281|471 8500
fax |281|471 8504

San Antonio
tel |210|277 6200
fax |210|277 6232

APPENDIX B

3100 West Slaughter Lane | Suite 101 | Austin, Texas 78748 | toll free 877 720 8690 | toll free fax 866 720 8692 | www.integrity-texas.com

(Partial transcript begins at 2:10:35 p.m.)

DR. HANDAL: Item Number 20.

MS. VANHOOSE: Okay. So Item Number 20 is related to Durable Medical Equipment. In our Medical Policy and Rules, we specifically lay out what DME is available to Medicaid clients. There are lots of DME products though, as you can imagine, and they're not all listed in policies, so for an adult who wants access to a DME -- a piece of DME that is not currently listed in policy, there is a process that takes place.

This process has been in place since October of 2012 and what we were trying to do with the intent of these Rules is to ensure that that process that is taking place for a provider to request a piece of DME that is not spelled out in medical policy for a client, that that process they go through is in Rule and is outward facing. It has not been previously posted in our policy, nor has that process been in Rule.

So the intent of these Rules is to put that process in Rule.

We have heard from some stakeholders that there are concerns with the process, and you'll hear some comments today.

Specifically the issue is that if a provider wants to request additional DME or DME that's exceptional, they

APPENDIX B

have to provide a minimum of two articles. You'll see that in Section -- Subsection (d)(6) of the Rule. There's concerns with that being part of the process.

What those two peer reviewed evidence based pieces of literature are used, are to ensure that the device is safe and effective for the client. It is the process that is currently being used at TMHP and with our office and Medical Director to review these requests.

We met with a stakeholder yesterday and we heard the concerns, and you'll hear more concerns today, and what I've committed to do is to look at other States to see if there are any other best practices and what those processes are as we move forward with these Rules. The intent, though, is to ensure whatever that process is, that we have it in Rule.

So we'll continue to work with stakeholders to have a conversation around the issues they have with this piece of the process.

And just to clarify, this is mostly for adults, children, under EPSDT. If they need a device, they can submit a form -- a prior authorization form. It goes through the same process as any other DME and it's reviewed for medical necessity.

MS. BIBBY: I have a question.

DR. HANDAL: Yes. Michele?

APPENDIX B

MS. BIBBY: So you said that you met with "a" stakeholder yesterday?

MS. VANHOOSE: Yeah. We sent the Rules out and we had a comment, an email. We received an email that a stakeholder was concerned and so we sat down and met with her to hear about her concerns. It's always --

MS. BIBBY: So when you sent the Rule out, how long was that window for comments to be received?

MS. VANHOOSE: So this is -- it'll officially be posted in the Register, but what we're trying to do in my area, what I encourage my staff is, when they're working on Rules or Policies, that they send that out to stakeholders that they're aware may have concerns or issues, so we know what the issues are before we come to MCAC so that we can try and address them before they even get posted in the Register.

MS. BIBBY: So did your staff receive any response from stakeholders?

MS. VANHOOSE: Yeah, on a regular basis with our Rules and Policies.

MS. BIBBY: I mean, I'm trying to understand, was it not until yesterday that you were aware -- excuse me, I have a cold -- that there were concerns?

MS. VANHOOSE: Yes. Me personally, yes.

MS. BIBBY: And you weren't aware of that until

APPENDIX B

yesterday?

MS. VANHOOSE: Yes, yes.

MS. BIBBY: Okay.

MS. VANHOOSE: Oh, I mean, we met yesterday. I received the concern a week or so ago.

MS. BIBBY: Okay. And you're planning -- your plan is to meet with other stakeholders?

MS. VANHOOSE: Yeah, any stakeholders that have concerns with the Rules, yes, we will definitely meet with them.

MS. BIBBY: Okay. And this two-step process, is that consistent with CMS guidance?

MS. VANHOOSE: So it is a process that the State has put in place for a service that is not currently a defined service. So we have the authority to review requests for services that are not defined in policy in our State plan in the process that we've established. So this process that was established was that the provider submit this information that's required in the Rule to TMHP. TMHP Medical Directors review the information that's provided, and then it goes to our office of Medical Director and the Medicaid Medical Director makes the final determination on whether or not we will allow for that DME.

MS. BIBBY: Okay. I'm understanding what you're saying. I'm a former employee of the HHSC Office of the

Ombudsman. And we received tons of complaints about Medicaid members, who had requests for Durable Medical Equipment that was endorsed by their physician, denied.

So the question that I'm asking is: Is there some guidance from CMS that is different from this two-step process that you're saying that the State is entitled to rightfully put in place?

MS. VANHOOSE: What we can do is: Like I committed to the stakeholder yesterday, is we'll look at other States' best practices and we can see what is there, but this is a process for -- we do not have to have permission from CMS to offer benefits outside of our State plan. We have the authority over determining what those benefits are, and this was the process. CMS does not review our processes, they review what we're offering. So this is the process that was put in place, but I understand there are concerns related to it. So I've committed to go back and work to see if this is the right process or not.

MS. BIBBY: Well, I'm not so much concerned about processes. I'm concerned about what is in the best interest of Medicaid members, and so, I would hope that if it is the best practice of many other States, that the State of Texas Medicaid Program would look at following the lead of perhaps those more forward-thinking States in terms of what is in the best interest of Medicaid members.

APPENDIX B

MS. VANHOOSE: I agree.

MR. JESSEE: Can I just ask for clarification?

DR. HANDAL: Yes.

MR. JESSEE: So Michele, what -- the issue that you have specifically is, is it that somebody's determining medical necessity outside the physician's recommendation and that there's utilization management associated with the request, or -- and I understand your previous role in the Office of the Ombudsman, and you're right, but I guess the point I'm making is: Physicians make recommendations about benefits today that are reviewed through MCO's utilization management or through TMHP through utilization management.

So I guess the question I have for you is: I just want to be clear what you're asking. Are you thinking that the processes being put in place by the Medicaid Division is going to be burdensome, --

MS. BIBBY: Yes.

MR. JESSEE: -- or potentially impact the member negatively?

MS. BIBBY: Absolutely burdensome --

MR. JESSEE: Okay.

MS. BIBBY: -- and absolutely have a negative impact on the Medicaid members.

MS. VANHOOSE: And we've heard --

MR. JESSEE: Okay.

APPENDIX B

MS. VANHOOSE: Yeah, and we have heard that concern and this was a process that was developed in 2012 and the intent of this Rule is to make sure it's transparent what process is and what we're hearing is there's concerns and questions about the process.

DR. HANDAL: Yeah.

MS. HORTON: Hi, Laurie.

MS. VANHOOSE: Hi.

MS. HORTON: I, too, am quite concerned about this coming from a university environment to find uncontested data or -- you know, you can always find something to counter one study in another.

So -- and with the way that our world is moving in technology, you know, something good might really become available and there may not have been an extraordinary amount of research done on it yet.

But the other thing that I have heard that causes me concern is that, one, I've never heard -- when you have a physician and a PT and an OT saying that this is going to be useful, I've never heard of the client having to go and research and find these -- you know, proof and find the studies. You know, many clients can't do that. Many providers can't do that. That takes a lot of time.

And you know, if you can't find a study that pertains to exactly this disability in this age group and

APPENDIX B

I've heard it, you know, these studies are being rejected because, you know, oh, well yeah, they had the same disability, but it was a different age group, or that they were the same age group, but they had a different disability, even though their need -- functional need was the same.

So I really have some problems with this and will have to vote against it because I think it's unreasonable to expect, you know, the providers and the clients to go do this scientific research.

MS. TIEKEN: I would like to comment as a home health provider. I find it unsettling that the organizations that represent home health industries in our State were not consulted about this and if they were, I apologize for that, but I don't think they were.

And if we, as providers, are not able to give you feedback and information and our perspectives on this particular issue and others, then I don't think you've done a service to our State, our -- the patients we serve and the providers who have to try to do that.

I can hardly get skilled nursing visits approved, much less go through this rigmarole to get somebody some DME. I just -- I couldn't support this as it is.

DR. HANDAL: I hear --

MS. VANHOOSE: I understand. I'm not sure what

process was used when this was developed. This was under our Office of Medical Director and I appreciate your concern about input. This is to --

DR. HANDAL: I have --

MS. VANHOOSE: -- process to make sure that it's -- you at least know what it is we're doing.

DR. HANDAL: Laurie, Gary can verify that I have the same concern. I've seen people needing sometimes basic stuff and not getting approved. So you know, I understood this was a way to streamline and help, but it really is not. It's not. That's my concern. It's really not helping.

MR. JESSEE: Yeah, I think the Rule was intended to provide some transparency and perhaps the transparency is where it's creating some additional concerns. So I mean, I think we're committed to going back and looking at that.

I guess a question I had for you, Laurie, and you may not know this is, because the original policy that's been in place since 2012 is unclear, has that resulted in just across the board denials of these DME -- of these needs or is the concern that because it was unclear, there was more approvals that people anticipate will no longer be approved or do you have any data on what the amount of denials?

MS. VANHOOSE: I have the data, but I think you've raised a good point. There's probably providers that don't

APPENDIX B

even know the process exists since it's not published, but I think there's definitely stakeholders here that can speak to concerns they have heard regarding how the process has worked in practice.

MR. JESSEE: So we have the -- so I guess the answer is: There is the ability to go back and visit some more about the policy and maybe even consider, you know, what's the appeal -- I mean, there is an appeals process and all of that, but I agree. I mean, it seems -- it would seem difficult for one provider may have the expertise or ability to push forward some support or research, but another provider may not and in the end, one member may benefit and one may not.

MS. VANHOOSE: Yeah. No, I think we can review it. There needs to be a standard. You know, we're just trying to put a standard in place to ensure that we are appropriately providing services that are safe and effective and what I've heard from many people is this may not be that standard.

DR. HANDAL: Dr. Walsh?

DR. WALSH: I just wanted to ask, do we have testimony by anyone?

DR. HANDAL: Yeah, we have two testimonies -- we have three testimonies actually.

So if you don't mind, let me hear the testimony

first, you know.

Ms. Maureen O'Connell?

MS. O'CONNELL: Good morning. My name is Maureen O'Connell, and I think I'm also known as the "a" stakeholder, because I was the one that met with HHSC yesterday.

I thank you for the opportunity to talk today about this. As you know, this process has actually been in effect since October of 2012. During that time, our office, the Southern Disability Law Center, has represented nine individuals who were caught up in this special exceptional circumstances process. And it is our opposition to the Rule is based on the experience of these clients.

To answer a question about the data, I did a Public Record request on the data between October 12th -- October 2012 and March 2015. There were nine requests for exceptional circumstances review on items of DME. Seven of them were denied. One of them that was approved was actually one of the Plaintiffs in the Federal lawsuit, so -- and she was the first to go, so she actually got approved. One other person, we don't know exactly what that was about, but apparently they were approved, too.

There's good reason not to move forward with this, and I put that in my comments, is we are at the point where CMS is just ready to issue their final DME Rules. We know

these Rules are going to change everything because for the first time since 1965, we are going to have a Federal definition of DME that all States must comply with. Right now every State can define it anyway they wish. That will no longer be the case.

Because the Federal definition of DME will change the scope of the benefit, it'll be clearly defined scope of benefit. We cannot move forward with creating an exceptions process when we don't have the scope fully outlined. It doesn't make any sense.

We also know that this -- the way it's set up right now is a two-step process. You have to go through a prior authorization process. You have to get denied. You have to have your DME provider request exceptional circumstances appeal and then you'll get denied there.

I have talked about the fact that this is extremely time consuming. One client -- the exceptional circumstances process alone -- not the prior authorization, just the exceptional circumstances process took six months. She got denied and then went to a fair hearing. Before it was all over with the fair hearing, one year had passed since the first request for this particular wheelchair.

The untimeliness of it is a huge problem for the clients. It's also very, very burdensome in that they have to go for so long only to be told no at the end.

APPENDIX B

In particular, the problem -- and you-all have addressed it -- is this requirement for research. And I gave an opinion -- I gave an example in one of my -- of one of my cases in my notes.

Oh, I'm up. Anyway, should I stop?

DR. HANDAL: I think it's clear now. Really, we've heard so much. There is other witnesses. If you don't mind, if we have time later on, we'll give you more time.

Susan Murphree?

I thank you so much for taking your time.

MS. O'CONNELL: Okay. Thank you.

MS. MURPHREE: Good afternoon. I'm Susan Murphree. I'm representing Disability Rights Texas. Thank you for the opportunity to provide comments on this item.

I just want to start off and end up with a request to delay any action on this. In terms of a balanced approach, it is good to move toward a more transparent, understandable system, but it is not good necessarily to make it more complex, create a delay for important services, or just rely heavily either on research or what other States are doing. Sometimes we might be the leader in what is best for people.

I think we can be instructed by that, but to have the whole Medicaid policy based on evidence based and not,

APPENDIX B

you know, balancing that with the consideration of a treating physician or other healthcare provider, who actually has first-hand knowledge of the individual and can really understand what the need is.

So the timing is really poor. It's just three months from now to where the CMS guidance will be available. It's already been proposed, already received comments. We're just waiting for the final outcome.

So it is a bit mysterious and curious as to why we need to rush through with these rules. So while we support having transparency, we also are concerned about the stakeholder input.

I participated at the invitation of HHSC, I think it was a year ago or maybe a little less, on a workgroup where they were looking at how the Medicaid Office would determine Medicaid policy. Evidence base was one of the criteria, so research evidence base, but several of us on the committee did express concern with relying way heavily on that and not relying on the medical necessity needs of the Medicaid participant.

So you know, we really didn't understand what "uncontested" research meant and this is not a Legislative mandate, as you've had with some of the other Agenda items or informational items. So the timeline is really sort of up to this State in terms of when to come out with an actual

APPENDIX B

Rule and we ask that you delay -- ask that that be delayed so you can get the Federal guidance, and then we can come out with a Rule and all of the concerns that you-all have mentioned, we share as well.

So thank you for the opportunity to comment.

DR. HANDAL: Thank you, Ms. Murphree. We appreciate you.

Ms. Hammon, Rachel Hammon?

MS. HAMMON: Good morning. My name is Rachel Hammon. I'm the Executive Director for the Texas Association for Home Care and Hospice.

In order to try and keep my comments brief, I do want to say I concur with all of the previous comments that were made and to support some of the points that have been made up on the dias today.

We found out about the Rule yesterday when the links went live. So we didn't know that this was happening, but we do want reiterate that we do appreciate the attempts at transparency, as well.

But again, I concur with all the concerns that we've heard today about this particular Rule and really would like to ask your support and reiterating that stakeholder input could be very valuable in shaping this Rule and a better Rule in the future. You know, certainly input would have been very valuable in the formulation of

APPENDIX B

this Rule in terms of the timing. Maybe it would have been reconsidered in terms of the timing and then some of the information related to this two-step process, as well, which has been very over-burdensome. You know, it's somewhat unclear as to why if one provider submits good evidence based research, why that would be kind of kept in the hole and not really then set as the standard for maybe another person that has the same issue.

So I mean, there is a lot of comments that we could have made really in working with HHSC and would appreciate that opportunity in the future and would appreciate holding back on these Rules.

DR. HANDAL: Thank you so much.

MR. HELLERSTEDT: Well, I didn't have a question for you.

MS. HAMMON: Yes, sir.

MR. HELLERSTEDT: I just want to sort of want to make some general points and maybe ask Ms. VanHoose -- am I pronouncing the name right? -- to comment a little bit.

First of all, the idea that CMS has not defined DME makes complete sense to me to wait for that to happen before adopting any kind of Rule. Having been a Medicaid Medical Director at one point in my career, this is a very knotty problem, and I think having -- waiting to have that clarity serves everybody's interest, and then once that

definition comes out, I'm sure it'll be crystal clear and there will be no controversy at all.

(Laughter.)

MR. HELLERSTEDT: Then you can involve the stakeholders an additional -- in additional discussions. In the meantime, I would like HHSC to explore a way to kind of back off from what seems to me on the face of it to be a very inappropriate standard of proof to -- and stop me if I'm wrong, but when we're talking about DME, we're not talking about FDA-approved drugs or medical devices, things that have to go through a rigorous kind of proof of safety and efficacy.

So how you could put that standard on these items is sort of beyond me, so if there's a -- and also, if I understand correctly, the process we're talking about here applies to adults, correct? So it doesn't apply to EPSDT. So somebody who is 20 years old and six months could get the exact same piece of requested equipment without having this standard applied to them -- or this process applied to getting that identical piece of equipment.

And I realize that's the way the Federal law works, but that kind of doesn't make sense to me, as someone who would want this to be medically reasonably based.

So those are my comments and I think we should -- I think we should postpone recommending this Rule for those

APPENDIX B

reasons.

MS. VANHOOSE: Thank you for those comments.

I think one of our concerns is CMS has been telling us these Rules are going to come out forever. So we are very hopeful they do come out and when those Rules do come out, we're going to have to look at all of our DME Policies and Rules, so that makes sense.

But just to clarify, it's the process today. So these Rules -- stuck in these Rules, the process is there. We're going to have to work -- it's two-step -- another two-step basically.

DR. HANDAL: Yes.

MS. VANHOOSE: This is the process today. With our vendor there's contract agreements, requirements around it, so stopping this Rule doesn't mean tomorrow that the process isn't still taking place, but we'll have to go back and look at the process, so.

MR. HELLERSTEDT: Another comment I would have -- again, correct me if I'm wrong, but this is -- we're talking about -- we're not talking about even managed care, so none of this even applies to managed care.

MS. VANHOOSE: Right, correct. We've met with our managed care staff, Gary's staff, to figure out how or what should be taking place in the managed care side.

MS. TIEKEN: That gives me even more concern.

APPENDIX B

MS. VANHOOSE: Yeah.

DR. HANDAL: Wait. I mean, Gary wants to say something.

MR. JESSEE: Well, I mean, I was just going to say really what Laurie has already said and that is: It sounds like, based on some of the testimony already today, that people aren't happy with the current process.

And I know, Maureen, you talked about some of the individuals that you've represented.

So there is something that needs to be done because obviously there's a Rule in place we were trying to make a little more clear. Of course, clarity is not always the best thing.

But you know, as I was saying to Dr. Hellerstedt here and I said to Laurie, I think if you give us an opportunity to take a look at the proposed language, maybe one of the solutions is the ability to request that sort of information if there is some reason that nobody can get to the place where it believes it's medically necessary. So maybe the exception would be that sort of information, as opposed to just right up front.

But I think we do need some time to visit internally to figure out the best next step, but it's been made very clear that what we're trying to propose as some clarification, we need to do a little more work on, so.

APPENDIX B

DR. HANDAL: I need a motion to send it back.

MS. DEWALSH: (Indiscernible).

DR. HANDAL: DeWalsh make the motion.

Second?

Mr. Smith?

MR. SMITH: What motion -- which motion is that?

DR. HANDAL: The motion is to not accept the publication, but send it back for further study.

MR. SMITH: Okay. I was going to table it, but if we already have a motion.

DR. HANDAL: So all in favor?

MS. BIBBY: I move -- do you still need?

DR. HANDAL: Moved by DeWalsh, second by Mr. Smith.

MS. BIBBY: Oh, okay.

DR. HANDAL: So all in favor, say "aye."

ALL: Aye.

DR. HANDAL: We'll send it back and motion denied.

(End of partial transcript at 2:36 p.m.)

* * * *

APPENDIX B

22

CERTIFICATION PAGE FOR AUDIO RECORDING

I, Mary Henry, certify that the foregoing in a correct transcription from the audio recording of the proceedings in the above-entitled matter.

Please take note that I was not personally present for said recording and, therefore, due to the quality of the audiotape provided, inaudibles may have created inaccuracies in the transcription of said recording.

I further certify that I am neither counsel for, related to, not employed by any of the parties to the action in which this hearing was taken, and further that I am not financially or otherwise interested in the outcome of the action.

I further certify that the transcription fee of $_____ was paid/will be paid in full by _____ _____.

*Mary D. Henry*
Mary Henry
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Ste. A-101
Austin, Texas 78748
512.320.8690
512.320.8692 (fax)

APPENDIX B

STATE OF TEXAS    )

COUNTY OF TRAVIS )

NOTARY PAGE

Before me, _Steven B. Wheeler_, on this day personally appeared Mary Henry, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office this _18th_ day of _August_, 2015.

STEVEN B. WHEELER
MY COMMISSION EXPIRES
July 18, 2017

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS
COMMISSION EXPIRES: _July 18, 2017_

**APPENDIX B**